**UNITED STATES of America,
Petitioner,**

v.

**METROPOLITAN DISPOSAL
CORPORATION, Respondent.**

**CR. No. 83–29–BU.**

United States District Court,
D. Oregon.

Oct. 11, 1985.

Amended Supplemental Findings of
Fact & Conclusions of Law Filed
Oct. 29, 1985.

Charles H. Turner, U.S. Dist. Atty., Portland, Or., and Bernard M. Hollander, Antitrust Div., Dept. of Justice, Washington, D.C., Richard B. Cohen, Antitrust Div., Dept. of Justice, San Francisco, Cal., for petitioner.

John S. Ransom, Ransom, Blackman & Simson, Portland, Or., for respondent.

## ON MOTION FOR JUDGMENT OF ACQUITTAL

JAMES M. BURNS, District Judge.

Respondent (MDC), pursuant to Rule 29, Federal Rules of Criminal Procedure, renews its motion for judgment of acquittal. MDC contends that its conduct could not have been found to be "willful" as necessary for conviction in a criminal contempt action. Respondent's motion is DENIED.

 On December 6, 1984, I denied respondent's initial Rule 29 motion for judgment of acquittal. I then found MDC in criminal contempt for willfully violating court orders. MDC now argues that *United States v. Garcia,* 751 F.2d 1033, 1035 (9th Cir.1985) requires a showing of "specific intent" to properly convict a defendant of criminal attempt. I do not agree.

The *Garcia* case interprets 18 U.S.C. § 665(a) a statute which deals with one who "embezzles, willfully misapplies, steals or obtains by fraud" certain monies. The Ninth Circuit reasoned that the term "willfully misapply" in § 665(a) required a specific intent to injure or defraud the United States.

The statute at issue here, 18 U.S.C. § 401(3) does not contain such language. Section 401(3) states:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as .... (3) Disobedience or resistance to its lawful writ, process, order, decree or command.

This circuit has held that "[a] contempt is a willful disregard or disobedience of public authority and the requisite wrongful intent may be inferred from [a] reckless disregard

of obligations to the court." *In Re Allis,* 531 F.2d 1391, 1392 (9th Cir.1976), *cert. denied,* 429 U.S. 900, 97 S.Ct. 267, 50 L.Ed.2d 185 (1976).

In *Goldfine v. United States,* 268 F.2d 941, 945 (1st Cir.1959), *cert. denied,* 363 U.S. 842, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960), the district court required the government to prove the elements of criminal contempt, including ... "that the defendant acted 'willfully.'" (*Id.* at 945). On defendant's appeal the Circuit Court affirmed stating:

> The only one of the ... elements which is really in dispute is ..., that the appellants acted willfully in failing to produce the aforesaid records. *Willfulness almost necessarily has to be proved as an inference from circumstantial evidence;* and in this case we cannot say that the district court erred in drawing that inference. Indeed we cannot see how the court could have failed to draw such inference. *The government does not have the burden of negativing all possible excuses for noncompliance with a court order. It is enough to make out a prima facie case for the government to show,* as the government did below, *that the appellants, in response to* the interim *court order* calling for the production of corporation records, *refused to surrender them when they were in existence and within their control. See, Nilva v. United States* 1957, 352 U.S. 385, 392, 77 S.Ct. 431, [435], 1 L.Ed.2d 415. (268 F.2d at 945) [emphasis supplied]

 I find the government has satisfied its burden in this case. Accordingly, respondent's renewed motion for judgment of acquittal is DENIED.

IT IS SO ORDERED.

## OPINION AND ORDER

On December 6, 1984, I found Metropolitan Disposal Service ("MDS") in criminal contempt for wilfully failing to produce certain business documents called for by a subpoena *duces tecum* dated August 7, 1981 and by an October 15, 1981 order of this Court.

The government recommends a fine of $10,000 be imposed on MDC and seeks $7,928.18 for costs of prosecution. MDC contends the fine amount is not appropriate in this case and objects to the government's request for costs. I address each issue separately.

*Amount of Fine*

The criteria to be considered in determining a proper fine for criminal contempt is set out in *United States v. United Mine Workers,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). According to the Court:

> In imposing a fine for criminal contempt, the trial judge may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future. Because of the nature of these standards, great reliance must be placed upon the discretion of the trial judge.
>
> * * * * * *
>
> It is a corollary of the above principles that a court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant.

*Id.* at 303–04, 67 S.Ct. at 701.

MDC contends its conduct was not "willful and deliberate defiance" but rather that it was, at best, merely negligent in its search for the documents. I am not persuaded by this argument.

At close of trial I found MDC had acted "willfully" in failing to produce the responsive documents. No reason is presented which persuades me now to accept MDC's contention that its failure to comply was due to "oversight". The record shows that

on October 23, 1981, MDC produced 245 pages of documents and represented by sworn affidavit that they were all the documents in MDC's possession which were responsive to the grand jury subpoena. On April 23, 1982, FBI agents, not familiar with MDC's files or operation, searched MDC's corporate office. They found an additional 1000 pages of documents responsive to the subpoena. This fully justifies my finding that MDC did not conduct their search in good faith.

■ MDC's failure to place a knowledgeable employee or officer in charge of the search and MDC's failure to conduct an adequate search for the documents goes far beyond the scope of "oversight". Accordingly, I find again, that MDC acted in deliberate defiance of the subpoena and this Court's order.

I am also required to consider MDC's financial resources when fixing the amount of a fine to be imposed. *United States v. United Mine Workers, supra,* at 304, 67 S.Ct. at 701.

MDC argues that it does not have excess financial resources and objects to the recommended $10,000 fine.

MDC's tax returns for fiscal years 1980, 1981, and 1982, show net income of $21,-635, $97,098 and $119,829 respectively.[1] They indicate an average net worth of approximately $3,000,000 and total positive cash flow of $946,124 from operations during the three year period. Andre Cozzetto, MDC's Controller, reported to Dun and Bradstreet that as of November 13, 1984, MDC's annual sales were up to $3,700,000 and profits for the last six months were up.[2]

On the other side of the ledger, MDC states it purchased equipment and incurred additional debt during the period requiring $780,665 of the positive cash flow. They also maintain that current liabilities and operation costs have increased significantly.

Sentences for criminal contempt are punitive in their nature and imposed for purposes of vindicating the authority of the court. *Gompers v. Buck Stove and Range,* 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911). One who defies the public authority does so at his peril. *United Mine Workers, supra,* at 303, 67 S.Ct. at 701. After reviewing the financial records submitted in this case, I am satisfied that a fine of $10,000 is neither arbitrary nor excessive.

*Costs of Prosecution*

■ 18 U.S.C. § 401 does not specify whether or not costs may be awarded to the United States if a defendant is found guilty of criminal contempt. In my view, 28 U.S.C. § 1918(b) applies. *United States v. Gering,* 716 F.2d 615, 625 (9th Cir.1983). Under § 1918(b) "a district court has discretion to award costs and to determine the appropriate amount ... as long as the items of cost are imposed only on non-indigent defendants in a non-discriminatory manner." *Gering supra* at 626.

28 U.S.C. § 1920 identifies items which are properly taxable under § 1918(b). Section 1920 provides:

(1) Fees of the Clerk and Marshal;

(2) Fees of the court reporter for all of any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees and exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses and costs

---

**1.** MDC submitted corporate tax returns for the fiscal years 1981, 1982 and 1983. Gross receipts or sales were indicated as $2,698,732, $2,724,611 and $3,398,207 respectively.

**2.** Memorandum of the United States in Support of Recommended Fine and Proposed Bill of Costs, Appendix C.

of special interpretation services under section 1828 of this title.

Section 1921 provides for per diem, mileage and subsistence for witnesses.

The government seeks $7,928.18 for costs of prosecution. Specifically it requests:

| | | |
|---|---|---|
| (1) | fees of the court reporter | $1,460.35 |
| (2) | fees for witnesses | $1,352.42 |
| (3) | fees for copies | $ 485.46 |
| (4) | travel and subsistence for government attorneys and staff | $3,745.05 |
| (5) | cost of FBI search of MDC's office | $ 884.00 |

## 1. Court Reporter

MDC objects to the imposition of costs for fees of the court reporter. It contends the transcripts were not "necessarily obtained for use in the case" but rather were ordered for the convenience of the government.

Expenses for the trial transcript and for transcribing arguments, pretrial proceedings and the like are allowable costs. *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 224 (9th Cir.1964). However, the statute requires that the transcripts be "necessary". This was neither a lengthy nor complex trial and few witnesses testified. *See United States v. Black*, 589 F.Supp. 594 (D.Ore.1984) (trial lasted sixteen days and approximately 56 witnesses were called). Accordingly, I find the trial transcript and transcripts for pretrial hearings and motions were not necessary.

Costs can also include the costs of grand jury transcripts furnished pursuant to the defendant's request and admitted into evidence at trial. *United States v. Pommerening*, 500 F.2d 92, 102 (10th Cir. 1974). The grand jury transcripts of Andre Cozzetto, Patricia Yeager, Toma Amendolara, and Lewis Cozzetto, although prepared prior to issuance of the petition, were furnished at MDC's request. Secondly, respondent agreed to use the transcripts at trial in lieu of testimony from the individuals. To that extent, I find the grand jury transcripts were "necessary" and award costs of $701.00.

## 2. Witness Fees

Travel and subsistance for government employees who testify at trial, is an allowable cost. *Pommerening, supra* at 102; *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1552 (5th Cir.1984). The government seeks witness fees as follows: Lawrence Hansen $562.00; Bernard H. Meyers $346.16; and Patricia A. Murphy $368.06.

The record shows MDC agreed to stipulate to the testimony of Bernard Meyers. The purpose of stipulation is to reduce litigation costs and make unnecessary the presence of witnesses. Mr. Meyers' trial testimony was primarily covered by the stipulation. I disallow his expenses as unnecessary.

MDC contests the amounts for both Lawrence Hansen and Patricia Murphy as exaggerated. A review of the government's itemization indicates both witnesses were required to travel from California to Portland, Oregon for the one-half day trial. Given the general nature of MDC's objection, I have no basis for finding the claimed amounts excessive and thus allow them as recoverable costs.

## 3. Fees for Copies

The government requests $485.46 for copying costs. The costs incurred for copying exhibits and documents are allowable under 28 U.S.C. § 1920(4). *Nisso-Iwai, supra* at 1553. Although no specific showing of "necessity" has been made, I find the amount reasonable and exercise my discretion in allowing it.

MDC objects to the government's requests for costs of the FBI search of Metropolitan Disposal Corporation, $884.00 and travel and subsistance for government attorneys and staff, $3,745.05. Defendant argues these items are not included in the statute and should not be allowed.

 Section 1920 does not present an exclusive list of expenses, however its provisions are strictly construed. *See Pommerening supra* at 102; *United States v. Vaughn,* 636 F.2d 921, 922 (4th Cir.1980). The costs of the FBI search of MDC's corporate office are not justified under the statute and there is little caselaw to support imposing them. Accordingly, these costs are disallowed.

 While it may be within my discretion to allow travel and subsistence costs, I do not find it appropriate here. Considering the nature of the case, the lack of complexity, and the evidentiary concessions made, the government has failed to make a showing of necessity to justify an award of such costs. *See United States v. Black, supra* at 597 n. 1.

Thus, costs will be allowed in the amount of $2,116.52; the Clerk will enter judgment accordingly.

IT IS SO ORDERED.

## AMENDED SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

On March 4, 1983, a Petition to Show Cause was filed by the United States which charged the defendant, Metropolitan Disposal Corporation ("MDC"), with knowingly and intentionally disobeying and resisting lawful orders of this Court. The Petition charged that MDC failed to produce documents called for at the time and place commanded by a subpoena *duces tecum* dated August 7, 1981, and by an October 15, 1981 Order of this Court. The Petition asked this Court to find MDC in criminal contempt for its failure to produce documents responsive to said orders.

This case was tried to the Court on December 6, 1984. At the conclusion of the trial, I found MDC in criminal contempt and made the following findings:

1. That a valid grand jury subpoena *duces tecum* had been served on MDC;

2. That on the date MDC was served, there were numerous MDC documents responsive to said grand jury subpoena;

3. That said responsive documents were at that time in MDC's possession, custody and control;

4. That MDC did not produce many of said responsive documents to the grand jury;

5. That MDC's failure to produce was willful, and

6. That, beyond a reasonable doubt, MDC was guilty of criminal contempt.

In addition to these findings, I asked the United States to propose more detailed findings of fact for my consideration. I now adopt these findings as Supplemental Findings of Fact and Conclusions of Law.

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

 1. Criminal Contempt under 18 U.S.C. § 401(3) is established when: (1) there is a clear and definite order and the contemnor knew of the order; and (2) the contemnor willfully disobeyed the order. *Chapman v. Pacific Telephone and Telegraph Company,* 613 F.2d 193, 195 (9th Cir.1979). The specific elements of criminal contempt which must be proved where the charge is based on failure to comply with a subpoena *duces tecum* are: (1) that there was valid service of the subpoena; (2) that the subpoenaed documents were in existence at the time the subpoena was served; (3) that the subpoena recipient had control of the subpoenaed documents; (4) that the recipient failed to make production of the documents at the time they were to be produced; and (5) that the failure to produce was intentional or willful. *Goldfine v. United States,* 268 F.2d 941, 945 (1st Cir.1959), *cert denied,* 363 U.S. 842, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960); *see also, Nilva v. United States,* 352 U.S. 385, 392, 77 S.Ct. 431, 435, 1 L.Ed.2d 415 (1957).

2. On August 7, 1981, the Clerk of the Court for the District of Oregon issued a grand jury subpoena with a schedule of

documents attached to be served upon MDC by the United States Marshal for the District of Oregon. The grand jury subpoena called for certain documents dated, prepared, received or sent after January 1, 1975, and commanded MDC to produce said documents to the grand jury on September 15, 1981. [GX 1]

3. On August 19, 1981, MDC was served with the grand jury subpoena. [GX 6—November 19, 1984 Stipulation between the parties (hereinafter "Stipulation") p. 2, ¶ 4; TR (J. Cozzetto) 48–49].

4. On October 8, 1981, MDC moved to quash the grand jury subpoena. This motion was argued to this Court on October 15, 1981 and, except as to certain documents that were allegedly responsive to Part IV, paragraph B, of the subpoena (which MDC claimed were privileged documents), the motion was denied and MDC was ordered to turn over all responsive documents to the grand jury by October 23, 1981. [Stipulation, p. 3 ¶ 6; GX 11 (February 9, 1982 Order of Reference)].

5. After receipt of the grand jury subpoena, MDC's Board of Directors met and decided, without conducting a search, that MDC did not have documents responsive to Part IV, paragraphs B., D., H. 1–7 and K of the grand jury subpoena, when in fact they did have such documents. [GX 14, pp. 26, 29–30, and 35–37, GX 8].

6. MDC placed Andre Cozzetto, who had worked for MDC on a full time basis only for approximately one year and who had relatively little knowledge about MDC's documents and filing system, in charge of the search for documents responsive to the grand jury subpoena. [GX 14 pp. 8–10, 19, Vol. II, p. 4; TR (J. Cozzetto) 50, 53].

7. Andre Cozzetto, as supervisor of MDC's search, did not personally observe the document search performed by other MDC officers or employees, nor did he ask them where or how extensively they had searched for documents. He merely took the documents handed to him and gave them to MDC's counsel without even re-viewing them. [GX 14, pp. 23–26, 31–33, 39–40, Vol. II, pp. 3–4].

8. MDC placed its President, James Cozzetto, in charge of the search for documents responsive to Part IV, paragraphs B, C, D, H. 1–7 and K of the grand jury subpoena. However, James Cozzetto did not search for any documents responsive to those paragraphs. [GX 14, pp. 21–26, 31–39; TR (J. Cozzetto) 56–58, 64].

9. On October 23, 1981, MDC produced to the grand jury, by mail, only 245 pages of documents and represented, in Andre Cozzetto's sworn affidavit of compliance, that these were all the documents MDC had which were responsive to the grand jury subpoena. [GX 2, Stipulation, p. 3, ¶ 9; TR (Murphy) 12].

10. On five separate occasions—October 27, 1981, February 18, 1982, February 22, 1982 (by letter), March 1, 1982 and March 17, 1982—MDC was warned by Department of Justice attorneys assisting the grand jury that they believed that MDC's search was insufficient. MDC did not respond to or make further compliance pursuant to those warnings. [Stipulation, pp. 4–5–, ¶s 10, 12–15, GX 3; TR (Meyers) 4042].

11. On April 22, 1982, the United States obtained a search warrant authorizing a search of MDC's corporate office at 8443 North Kerby in Portland, Oregon, for documents responsive to the grand jury subpoena. [GX 4; TR (Murphy) 16].

12. On April 23, 1982, after a 45 minute briefing by a Department of Justice attorney, seven FBI agents searched MDC's office pursuant to the April 22, 1982 search warrant. In less than three hours, said FBI agents searched all seven of MDC's file cabinets and the other areas in MDC's corporate office where documents were kept. The FBI agents, who were not familiar with MDC files, MDC's operation or the trash industry, found and seized over two boxes of documents (over 1000 pages of documents) responsive to the grand jury subpoena that had not previously been turned over either to the grand jury or to the Court. [GX 5, GX 8, GX 100–161, GX

200–321, GX 400–419, GX 500–505, GX 600–614, and GX 638–747; Stipulation, pp. 5–10, ¶s 16 a–u, 17–30; TR (Murphy) 16–23].

13. The documents marked as GX 100–162, 200–321, 400–419, 500–505, 600–614, 638–747 which were seized during the search of MDC's corporate office were:

a. Dated, prepared, received or sent between January 1, 1975, the beginning date of the time period covered by said grand jury subpoena, and August 19, 1981, when said grand jury subpoena was served on MDC, and were in MDC's possession, custody and control at the time said grand jury subpoena was served on MDC; [GX 8].

b. Not produced to the grand jury or the Court at any time prior to April 23, 1982 search of MDC's corporate offices; [Stipulation, pp. 5–9, ¶ 16 and

c. Responsive to said grand jury subpoena.

For example:

(1) GX 100 is a document titled "Final Settlement Agreement." It is dated March 20, 1980 and records an agreement between MDC and SCA Services of Oregon (hereinafter referred to as "SCA" a competing provider of commercial trash collection services in the Portland metropolitan area). It states in part that it "covers any and all outstanding oral agreements made by any prior management of SCA Services Inc., and Metropolitan Disposal Corporation with regard to trading of accounts, subcontracting and bid and performance bond costs." Said document was called for by certain paragraphs of said grand jury subpoena. [GX 100, GX 1; Stipulation, pp. 5–6, ¶ 16 a; TR (J. Cozzetto) 57–58].

(2) GX 109 is a signed copy of a promissory note by MDC for $105,417.89 to SCA, dated August 13, 1979, which required monthly payments by MDC to SCA. It was called for by certain paragraphs of said grand jury subpoena. [GX 109, GX 1; Stipulation, p. 6 ¶ 16 b].

(3) GX 115–162 are trade lists, notes and other documents showing the trading, during the period 1977 through 1978, of many accounts between and among MDC and a number of its competitors, including SCA, Vogel Brothers, A. Walker Disposal, McInnis Sanitary Service and Campagna & Zanni Refuse Service, Inc., These documents were called for by certain paragraphs of said grand jury subpoena. [GX 115–162, GX 1; Stipulation, p. 6, ¶ 6, ¶ 16 c; TR (J. Cozzetto) 64].

(4) GX 318–320 is a three-page document dated March 25, 1979 entitled "Accounts Receivable from Metropolitan Disposal Corporation." It lists the names of specific MDC accounts served by SCA and the amounts due SCA. This document was called for by certain paragraphs of said grand jury subpoena. [GX 318–320, GX 1; Stipulation, p. 7 ¶ 16 j].

(5) GX 400–419 and 501 are materials concerning bids for trash collection to the State of Oregon, the City of Portland, the Portland Public Schools and Portland State University. These documents were called for by certain paragraphs of said grand jury subpoena. [GX 1, GX 400–419, GX 501; TR (J. Cozzetto) 66–69].

14. SCA, a trash hauler and a competitor of MDC, received a grand jury subpoena with document requests identical to the one served on MDC, and produced to the grand jury documents identical to or similar to those marked as GX 100, GX 109, GX 115–162, and GX 321 in response to said grand subpoena. [GX 7, GX 100, GX 109, GX 115–162, GX 321; TR (Murphy) 20–23].

15. MDC's failure to place a knowledgeable official in charge of its search for documents responsive to the grand jury subpoena, its failure to conduct an ade-

quate search for those documents and its failure to heed at least five warnings that its production was inadequate, shows that MDC acted with a reckless disregard of its obligations to this Court. Such reckless disregard establishes that MDC acted willfully in failing to produce documents responsive to the grand jury subpoena and this Court's Order of October 15, 1981 and thus is guilty of criminal contempt. *United States v. Baker*, 641 F.2d 1311, 1317 (9th Cir.1981); *United States v. Greyhound Corp.*, 508 F.2d 529, 531–532 (7th Cir.1974); *In re Allis*, 531 F.2d 1391, 1392 (9th Cir.1976), *cert. denied*, 429 U.S. 900, 97 S.Ct. 267, 50 L.Ed.2d 185 (1976).